# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause Nos. CR 12-65-GF-BMM |
| | CV 16-10-GF-BMM |
| Plaintiff/Respondent, | |
| vs. | |
| MIKE ALFONS CAMPA, | |
| Defendant/Movant. | |
| UNITED STATES OF AMERICA, | Cause Nos. CR 12-65-GF-BMM |
| | CV 16-11-GF-BMM |
| Plaintiff/Respondent, | |
| vs. | |
| SUZETTE GULYAS GAL, | |
| Defendant/Movant. | |
| UNITED STATES OF AMERICA, | Cause Nos. CR 12-65-GF-BMM |
| | CV 16-16-GF-BMM |
| Plaintiff/Respondent, | |
| vs. | |
| ANDRAS ZOLTAN GAL, | |
| Defendant/Movant. | |

## ORDER DENYING § 2255 MOTIONS AND
## DENYING CERTIFICATES OF APPEALABILITY

This case comes before the Court on three separate motions under 28 U.S.C.

1

§ 2255 filed by Defendants Mike Campa, Suzette Gal, and Andras Gal.  All are

federal prisoners, and each is proceeding pro se.  The three motions are addressed

together because they present similar and interdependent claims.

## I.  Background

### A.  The Defendants and the Oil and Gas Scheme

Defendants Mike Campa and Suzette Gal are married to each other.

Defendant Andras Gal is Suzette's son and Campa's stepson.  These three persons

and three others—Krisztian Gal (another son/stepson), Steven William Carpenter,

and his girlfriend Dana Yvonne Kent—were indicted together on one count of

conspiracy to commit investment fraud by wire and mail, a violation of 18 U.S.C. §

371 (Count 1); one count of wire fraud, a violation of 18 U.S.C. § 1343 (Count 2);

and one count of mail fraud, a violation of 18 U.S.C. § 1341 (Count 3).

The prosecution centered on a scheme to obtain money from investors for a

non-existent oil and gas development project on the Fort Peck Indian Reservation.

In 2007, Domestic Energy Solutions, a company purportedly headed by Defendant

Suzette Gal, obtained three drilling leases through a member of the Fort Peck

Tribes.  The leases were not paid for and were cancelled in October 2007.  1 Trial

Tr. (Doc. 466) at 90:9-95:12.  In 2010, Domestic Energy Solutions was succeeded

by United States Oil and Gas, which, likewise, did not obtain leases.  *Id.* at 99:12-

22.

Campa and Carpenter nevertheless represented to potential investors that they not only held leases, but actively were running a legitimate drilling operation on the Fort Peck Reservation. *See, e.g.*, 2 Trial Tr. (Doc. 467) at 56:19-83:13, 97:20-128:6, 150:5-166:21. Despite many representations to the contrary, no steps of any kind were taken to lease land, post bonds, plan operations, or survey or explore for oil, much less to drill, produce, refine, sell, or ship oil or gas. *See, e.g.*, *id.* at 54:13-55:13, 93:22-94:22, 258:18-267:19.

Campa and Carpenter used investors' money to pay personal expenses and to pay off other investors. Suzette and Andras Gal had no other apparent source of income. According to some investors as well as herself, Suzette Gal participated in a few meetings and phone calls and signed documents representing that she played a role in the project. *See, e.g.*, 2 Trial Tr. at 151:18-153:21; 5 Trial Tr. (Doc. 470) at 249:5-252:17. Andras Gal aided Campa by maintaining bank accounts to receive and distribute the proceeds of the fraud and also gave Campa access to his personal account. *See, e.g.*, 6 Trial Tr. (Doc 471) at 101:20-106:24, 110:3-112:10.

Krisztian Gal, like Andras, maintained an account to receive and distribute proceeds of another of Campa's frauds concerning non-existent gold mining operations in Arizona. Suzette Gal and Campa both benefitted from Andras's and Krisztian's assistance, because both owed money that would have been subject to discovery and seizure had they maintained accounts in their own names. *See, e.g.*,

3

5 Trial Tr. at 9-11; 6 Trial Tr. at 21:2-27:10, 41:20-43:12, 46:3-12.

## B. Pretrial Proceedings

The defendants were arrested in California.  When they appeared in this Court, each was found financially qualified for the appointment of counsel under the Criminal Justice Act.  Campa was ordered to make payments toward the cost of counsel at the CJA hourly rate, *see* Am. Order (Doc. 45) at 2, but Suzette and Andras Gal were not required to pay anything.  Assistant Federal Defendant Hank Branom was appointed to represent Campa, Jeffry Foster to represent Suzette Gal Order (Doc. 51), and Lindsay Lorang to represent Andras Gal, Order (Doc. 61).

About three weeks before trial, on April 1, 2013, Branom filed a motion to withdraw from Campa's representation.  At the hearing on the motion, Campa was asked to explain why he wanted new counsel.  Campa said he had "interviewed several attorneys in the Great Falls area, but none of them would take the case because they said [Campa's] money was marked as no – was obtained fraudulently."  Hr'g Tr. (Doc. 461-1) at 8:16-19.

He also stated that he intended to plead guilty "but I wanted to make sure that I was able to talk, before I did that, with the FBI and the U.S. Attorney."  *Id.* at 12:4-7.  He explained:

> I have significant information that I wanted to share that my family, the three people that are – were arrested with me, you know, are 100 percent innocent.  There is – their attorney can't properly represent them because they don't have all the information.  And I

4

have been asking for five months to meet with their attorneys so I can give them the information they need.

Everybody's been telling us, Oh, you guys all have separate attorneys, you have different interests. Which we all have the same interests: they are innocent, I'm not. Okay? I've been trying to meet with them so I can give them the proper information. There is just no way that my family can get a fair trial unless their attorneys have all the information.

*Id.* at 13:5-18. Counsel's motion to withdraw was denied because there was no evidence that counsel and Campa could not communicate. *Id.* at 26:12-27:20.

### C. Campa's Guilty Pleas

On April 22, 2013—the day before trial began—Campa pled guilty to all three counts of the Indictment. He disputed the prosecution's contention that Suzette Gal was involved. He instead named only Carpenter and two unindicted employees as participants in his schemes. *See* Change of Plea Tr. (Doc. 276) at 26:21-27:5. Campa also disputed the amount of money involved in the fraud.

The United States averred that the oil and gas scheme brought in about $675,000 and the Arizona scheme pushed the total restitution to about $2.6 million. *Id.* at 13:7-14:13. Campa insisted that the total amount of the loss from the Indictment scheme was $250,000 to $350,000 and that the Arizona gold mine was "100 percent legitimate." *Id*. at 30:2-9, 35:9-19. Campa admitted facts, however, that supported each element of each count alleged in the Indictment. *See generally id.* at 26:21-36:7.

5

### D.  Trial

For Carpenter and Suzette, Andras, and Krisztian Gal, trial commenced on April 23, 2013.[1]  On April 28, 2013, the Sunday before the fifth day of trial, the United States filed notice that Suzette Gal and Campa had violated Fed. R. Evid. 615 by speaking about the trial on the jail telephone despite Gal's intent to call Campa as a witness in her defense.  *See* Notice (Doc. 284).[2]

The following day, Campa was called as a witness in Suzette Gal's case-in-chief.  He testified that he knew he was selling fraudulent investments.  He claimed that he used Suzette's name and fabricated facts about her to deceive investors.  He further claimed that he had investors wire funds to accounts controlled by Andras and Krisztian Gal.  And, finally, he testified that none of the Gals knew he was doing anything illegal.  *See, e.g.*, 5 Trial Tr. at 96:15-110:18, 207:20-208:10. Campa was questioned about, among other things, his prior criminal convictions for fraud and numerous cease-and-desist orders intended to stop him from doing whatever he was doing on the grounds that his practice was fraudulent.  *See, e.g.*, *id*. at 77:5-83:9, 197:1-207:19.

Suzette, Andras, and Krisztian Gal also testified in their own defense cases-

---

[1]       Kent pled guilty and was sentenced before trial.  Her role in the conspiracy was minor. No one called her as a witness at trial.

[2]       After trial, Campa and Suzette Gal were charged in separate cases with contempt of court.  *See* Information (Doc. 4), *United States v. Campa*, No. CR 13-48-GF-SEH (D. Mont. filed May 21, 2013); Information (Doc. 6), *United States v. Gal*, No. CR 13-49-GF-SEH (D. Mont. filed May 21, 2013).  Both were convicted.

in-chief.  Cross-examining Suzette Gal, the United States elicited testimony that she and Campa had violated the trial judge's order prohibiting communication with witnesses.  *See* 6 Trial Tr. at 27:11-29:5.  In addition, in its rebuttal case, the United States introduced evidence that Campa made three telephone calls from jail in August, September, and October of 2012.  In those calls, Campa said he would "take the fall" for his family, "plead just to get the charges dropped against Suzette and her son Krisztian," and "hold[] out to get the best deal for everyone."  6 Trial Tr. at 227:3-230:12, 236:21-237:19.

The jury deliberated for two hours and fifteen minutes.  It found Suzette Gal, Andras Gal, and Carpenter guilty on all counts.  Krisztian Gal was acquitted on Counts 2 and 3 and convicted only on Count 1.

### E.  Sentencing

Presentence reports were prepared.  As to Campa, Suzette Gal, and Krisztian Gal, the probation officer found the Arizona gold mining scheme was relevant conduct under U.S.S.G. § 1B1.3(a), and so included losses from it in calculating the advisory guideline range.  Funds from that scheme were not routed through Andras's accounts, so the Arizona scheme was not deemed relevant to his offense.

The court overruled an objection to use of the Arizona scheme against Suzette Gal.  On August 30, 2013, the Court sentenced Suzette Gal to serve 40 months in prison on each count, with all three terms to run consecutively, for a

total of 120 months in prison, followed by a three-year term of supervised release.

Judgment (Doc. 415) at 2-3.  She was sentenced to serve 6 months on the

misdemeanor contempt conviction, concurrent with the felony sentences.

Judgment (Doc. 24) at 2, *United States v. Gal*, No. CR 13-49-GF-SEH (D. Mont.

Sept. 9, 2013).

Also on August 30, 2013, the Court sentenced Andras Gal to serve 60

months on Count 1, 72 months on Count 2, and 72 months on Count 3, with all

three terms to run concurrently, for a total of 72 months, followed by a two-year

term of supervised release.  Judgment (Doc. 417) at 2-3.

Campa's sentencing, however, was delayed.  After Campa received the draft

presentence report, he filed motions to recuse the trial judge, withdraw his guilty

plea, and vacate the post-trial order restraining the defendants from dissipating

their assets.  In a hearing on the motions, counsel for Campa, Hank Branom, stated

he had filed the motions because Campa demanded that they be filed.  The

presiding judge removed Branom from the case due to his failure to exercise his

professional judgment.  The Court appointed new counsel, Mayo Ashley, for

Campa.  *See* Hr'g Tr. (Doc. 475) at 7:6-8:20; Order (Doc. 408).  The Court denied

the motions to recuse and to withdraw the guilty plea.  *See* Hr'g Tr. (Doc. 530) at

13:15-14:7, 21:17-22:5; Order (Doc. 445).  The Court deferred ruling on the

motion to vacate the restraining order pending findings of fact at sentencing.  Hr'g

Tr. (Doc. 530) at 24:2-25; *see generally* Presentence Status Conference Tr. (Doc.

532) (Campa and Krisztian Gal only).

At Campa's sentencing, the United States called Matthew Shumaker as a

witness regarding the Arizona scheme, which underlies some of Campa's claims in

his § 2255 motion.  Shumaker, the chief mineral examiner for the United States

Department of the Interior, was in charge of quality control for mining claim

evaluations in the western United States, including the area of Arizona where the

projects that Campa pushed—Crystal Pistol, later reborn as Liberty Bell— were

purportedly situated.  Shumaker's testimony demonstrated the fraudulent nature of

the Arizona scheme as well as its similarity to the oil and gas scheme:

> Prosecutor:   Now is that a location, at least from your investigation,
> that a large-scale mine would want to go?
>
> Shumaker:   Well, you can only have a mine where you actually have
> minerals to mine. . . . It's very difficult to produce
> placer gold, as is what's claimed there, in an area that
> doesn't have enough water.  So it's a terrible location
> from a production point of view.
> . . .
>
> Prosecutor:   Now in this case, there was a claim that there would be
> a $10,000 investment and there would be a return of
> approximately $25,000 to $40,000 per year.  Was that
> according to your investigation, sir?
>
> Shumaker:   That sounds familiar.
>
> Prosecutor:   Okay.  Now would that have been possible based on
> what you saw at the location and what your
> investigation revealed?

Shumaker:    It would have been unlikely in the greatest extreme.

. . .

    The amount of gold that was asserted to be present at this location varied over time.  The assertions varied over time, I should say.  Now historically, there's gold there.  There's no question about it.  But the amount of gold that could be produced out of there was the sort of gold in quantity that could be produced only by dry washing methods, without a lot of water.  It was produced most prevalently during hard economic times when there was no welfare safety net, where your choice was either dry-wash some gold or starve.  I've seen gold asserted to be 200 – or 2 million ounces.  I've seen it 450 million ounces.  These were numbers that were really high.

. . .

    [A] gold deposit . . . that contains a 5-million-ounce – 5 million ounces of gold is considered in the mining industry to be a giant deposit.  That would make, that would make news in the *Wall Street Journal*.  That's just 5 million. . . .

    [I]n essence, the amount of gold being touted out of the Crystal Pistol area was more gold than has been produced in Montana between 1862 and 1968.

Prosecutor:    Let's talk now about the plan of operations and how that works with respect to the [Bureau of Land Management].  Can you explain to the Court why that's important?

Shumaker:    It is important.  One of the things that I saw in some of the advertising, if you will, at the Crystal Pistol and later at the Liberty Bell website is that they said that they were producing gold and selling some of the gold that they had produced.

. . .

    As long as you're going to disturb less than 5 acres and you're doing so in an area that's not an area of critical environmental concern or a withdrawn area, you

10

need only file a notice with the [BLM], and you can go and do that after 14 days. You cannot excavate more than 1,000 tons, nor can you sell any of the material that you excavate.

. . .

  Liberty Bell . . . said they were going to explore, basically is what they told BLM. They had, at one time or another, filed a plan of operation, but had never been approved. And . . . the first plan of operation that they sent in was incomplete. BLM wanted more information. And even as of today, that plan of operation has not been approved.

Prosecutor:  So they weren't permitted to sell, then, is the short of it?

Shumaker:  That's the short answer.

Prosecutor:  Let's talk now about the water. Can you tell the Court about the water and how that relates to the mine?

Shumaker:  . . . It appeared that they had a well capable of producing 35 gallons of water per minute. It may be that later they were able to make that well produce more water. And they actually had a right to that water. They had obtained a state permit. Groundwater in Arizona is a state responsibility.

  And then I looked at their website and determined that it appeared that they wanted to produce approximately 300 cubic yards per hour. So I performed a back-of-the-envelope calculation as to how much water it was going to require to actually wash that much sand and gravel to liberate the gold from it, and I came up with a rough figure of 5,000 gallons of water per minute. Now, okay, there may be some ways to improve on the water usage and get that down to 3,000 gallons of water per minute, but that's still a whole lot more than 35 gallons per minute.

. . .

  [T]hey wouldn't have been able to process successfully with 35 gallons per minute or 100 or even

11

> 500 gallons per minute if they had that amount from a
> well.

Campa Sentencing Tr. (Doc. 546) at 30:18-25, 31:25-32:7, 32:11-22, 32:25-33:4,

33:15-25, 34:15-21, 35:3-36:16.

On January 30, 2014, Campa was sentenced to serve 60 months on Count 1,

60 months on Count 2, and 240 months on Count 3, consecutively, for a total of

360 months in prison, followed by a three-year term of supervised release.

Judgment (Doc. 523) at 2-3.  He was also sentenced to serve 6 months on the

misdemeanor contempt conviction, concurrent with the felony sentences.

Judgment (Doc. 38) at 2, *Campa*, No. CR 13-48-GF.

### F.  Appeal

All defendants except Kent appealed.  The Ninth Circuit determined that the

evidence was not sufficient to support Krisztian's conviction on Count 1.  It

affirmed the defendants' convictions and sentences in all other respects.[3]  Campa's

conviction became final on June 25, 2015.  Suzette and Andras Gal timely

petitioned for rehearing.  Their petitions were denied, and their convictions became

final on August 18, 2015.  *See* 28 U.S.C. § 2255(f)(1); *Gonzalez v. Thaler*, __ U.S.

__, 132 S. Ct. 641, 653-54 (2012).

---

[3]      The United States filed a separate indictment against Krisztian based on the Arizona
gold-mining scheme.  He pled guilty in that case, was sentenced to time served, and did not
appeal. *See generally United States v. Gal*, No. CR 15-37-GF-BMM (D. Mont. judgment
entered July 10, 2015).

### G.  Post-Conviction Motions and Recharacterization

In mid-October 2015, Campa, Suzette Gal, and Andras Gal each filed *pro se* motions with the Court.  Each was given notice that the Court intended to recharacterize his or her submission as a motion under 28 U.S.C. § 2255.  Each was given an opportunity either to withdraw the motion or to add any additional claims intended to be raised under § 2255.  *See Castro v. United States*, 540 U.S. 375, 383 (2003).

Each defendant was also advised that conclusory allegations were not sufficient.  The Court gave each defendant one or two examples of conclusory allegations, and each defendant was told what he or she needed to specify instead. *See* Order (Doc. 612) at 2 (Andras Gal); Order (Doc. 614) at 2-3 (Suzette Gal); Order (Doc. 615) at 2-3 (Campa); Order (Doc. 616) at 2-3 (second order to Andras Gal).

Each defendant responded by agreeing to recharacterization and filing amended motions, using forms provided by the Court.  All three defendants claim that their lawyers had been incompetent and, if only counsel had done what the defendants wanted them to do, everything would have turned out favorably.

### II.  Preliminary Review

Each defendant's motion is subject to preliminary review before the United States is required to respond. The Court must determine whether "the motion and

the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts.

A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). It remains the duty of the court "to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

### III. Claims and Analysis

The defendants claim their counsel were ineffective in various respects. Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). At this stage of the proceedings, each defendant must allege facts sufficient to support an inference (1) that his or her counsel's performance fell outside the wide range of reasonable professional assistance, *id.* at 687-88, and (2) that there is a reasonable probability that, but for counsel's unprofessional performance, the result of the proceeding would have been different, *id.* at 694. "[T]here is no reason . . . to address both components of the

14

inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### A. Suzette Gal's Counsel

#### 1. Allegations by All Defendants

Each defendant claims that Jeffry Foster, who represented Suzette Gal, wielded "undue influence" over other counsel and committed misconduct that prejudiced all of them.  Each defendant alleges that Foster was being investigated by the Office of Disciplinary Counsel for "serious misconduct" and subornation of perjury in connection with this case when, under the pressure of his knowing wrongdoing, he committed suicide. *See* A. Gal Am. § 2255 Mot. (Doc. 622) at 9-10; A. Gal Mot. for Release (Doc. 620-2) at 1-2; A. Gal Mot. for Counsel (Doc. 611) at 1-2; S. Gal Am. § 2255 Mot. (Doc. 619) at 5-5 ¶¶ A-B & Supp. (Doc. 619-2) at 1-3; S. Gal Mot. for Counsel (Doc. 609) at 1-4; Campa Mot. to Stay Order (Doc. 613) at 4-5, 6-7, 9-10, 11 & Exs. S at 1-5 (Doc. 613-1 at 23-27); Campa Mot. to Stay (Doc. 617) at 1-2, 3; Campa Am. § 2255 Mot. (Doc. 618) at 1A-2A, 8A, 1B, 9B, 1C-2C, 2D; Campa Exs. Item 3 (Doc. 625) at 4-5.

Defendants' allegations are conclusory and without foundation.[4]  None of

---

[4]    Here is some of what Foster said about his client at her sentencing hearing: I'm often asked by friends and family why it is I take on this job of defending people who have been accused of crimes, and, you know, my automatic reaction is that, "Well, I believe in the Constitution.  I believe in the Sixth Amendment right to counsel."  And I always say that, "It's an honor to walk with people in their most difficult time."

But it wasn't until this case, Your Honor, that I found out that there is another purpose, and that is to defend people who honestly believe that they are innocent.  And Suzette Gal, despite what the jury found, based upon the evidence. [sic] And I don't knock the jury, because I believe in that component of the

the defendants suggests a hint of reason to believe Foster's death had anything at all to do with any of them.  None of the defendants identifies any alleged act by Foster that was wrongful.  None of the defendants identifies any alleged false statement made by anyone at trial.[5]  None of the defendants identifies any act by other counsel that was either based on Foster's "influence" or wrongful.  The defendants point to letters written by Andras Gal's counsel, Lindsay Lorang, and Krisztian Gal's counsel, Mark Meyer, but counsels' letters do not remotely suggest Foster exercised "undue influence" over anyone.  *See* Lorang Letter (Docs. 611-1, 609-1) at 1 (describing Foster as a "mentor"); Meyer Letter (Doc. 609-1) at 1-2 (stating the disciplinary complaint against Foster was filed "by Mike Campa"); *see also* ODC Letter to Campa  at 1 (Doc. 613-1 at 22 ("Ex. R")).

This claim is denied for lack of merit.

### 2.  Allegations by Campa Only

Campa adds that Branom was ineffective because he allegedly allowed Foster to meet with Campa before trial.  Campa further states that he gave

---

Constitution just as much as I believe in any other component, but to have the privilege and the honor of defending somebody who honestly believed in her innocence was something different than I had ever had to encounter before in my time as a criminal defense attorney.
S. Gal Sentencing Tr. (Doc. 478) at 26:2-18.
[5]      Campa accuses Krisztian Gal of committing perjury in pleading guilty to conspiracy to commit fraud in connection with the Arizona scheme.  *See* Campa Am. § 2255 Mot. at 23 ("Mr. Gal himself committed perjury.").  Campa also filed a disciplinary complaint against Krisztian's counsel, Mark Meyer, for allowing Krisztian to enter a guilty plea.  *See* ODC Letter to Campa (Doc. 625-6) at 1.  Although Campa believes he was "implicated" by Krisztian's plea, Am. § 2255 Mot. at 9B, Campa was already thoroughly "implicated" by the testimony at his own sentencing hearing a year and a half earlier.

"coached perjured testimony," but he does not say what it was.  From these facts,
Campa concludes that Foster suborned perjury and tampered with witnesses.
Campa Am. § 2255 Mot. at 1A (Doc. 618 at 6).

These allegations prove difficult to comprehend.  Months before Campa
allegedly met with Foster, he told his mother and Suzette Gal that he intended to
plead guilty and would try to get his family members off.  6 Trial Tr. at 227:3-
230:12, 236:21-237:19.  Three weeks before trial, Campa told the presiding judge
that he personally wanted to meet with the Gals' attorneys but "everyone" told him
he should not.  *See* Hr'g Tr. (Doc. 461-1) at 13:4-19; Campa Exhibits Ex. 1 (Doc.
625-1) at 1.  Campa has not identified any way in which he was prejudiced by a
decision on which he insisted.

Even setting aside Campa's own statements and decisions long before trial,
it was not unreasonable for Branom to trust Foster.  They served as counsel for co-
defendants in many cases over the years.  Branom also did nothing unreasonable
by advising Campa to plead guilty.  A competent lawyer confronting the
prosecution's evidence against Campa could hardly have advised anything else.
Even if Branom thought Campa was perjuring himself, he did nothing
unreasonable by holding his tongue, as Campa's perjury could have resulted in
additional charges against him.

The facts that Campa alleges do not support an inference that Branom's

17

performance was deficient or that there was any prospect of a different outcome. Neither prong of the *Strickland* test is met.  This claim is denied.

### 3. Conclusion

Nothing the defendants say about Foster and nothing in the record of the case provides any reason to believe Foster did anything wrong or other counsel did anything wrong because of Foster.  The defendants merely seize on Foster's untimely death and seek to use it for their benefit.  Their allegations ring hollow. Their claims are denied for lack of merit.

Suzette Gal and Andras Gal make no other allegations.  Consequently, the remaining claims relate only to Campa.

### B.  Probation Officer's Statement

Campa contends that Branom told him that the probation officer who prepared the presentence report "was 'not buying the government's allegations of fraud surrounding the gold mine'" in Arizona.  Campa then explained to the probation officer how the gold mine investment scheme worked and how he earned a $900,000 fee.  Campa claims he was prejudiced because the officer then used the Arizona scheme against him in the draft presentence report.  Am. § 2255 Mot. at 2A.

Whatever Branom said to Campa or Campa said to the probation officer, Campa's statements were not the reason that he was held responsible for the

Arizona gold mine.  Evidence introduced at trial and at sentencing established the basic facts underlying the scheme, Campa's role in it, and the commingling of its proceeds with the proceeds of the oil and gas scheme in this case.  *See, e.g.*, Sentencing Tr. (Doc. 546) at 16:10-19:14, 22:3-23:4, 24:17-25:3, 25:17-26:8, 28:24-48:13.  Neither prong of the *Strickland* test is met.  This claim is denied.

### C.  Counsel's Advice re: Sentencing Accountability

Campa contends that Branom "assured" him the Arizona gold mine "investment could not be used against [him] at sentencing," Am. § 2255 Mot. at 2A, and that he "would not be held accountable for anything [he] had not pled guilty to." *Id*. at 3A-4A.  He also claims he did not know all the terms in Counts 1, 2, and 3 could run consecutively.  *Id.* at 1B.  And Campa claims the prosecutor was not "honest" at the change of plea hearing, because he estimated restitution would total $2.6 million rather than the total of $5.18 million ultimately imposed.  *Id.* at 4A.  Campa concludes that he would have gone to trial had he known Branom and the prosecutor were wrong about these things.  *Id.* at 4A.

To prevail on these allegations, Campa must allege facts sufficient to support an inference that counsel's advice about his guilty plea or sentence was "so incorrect and so insufficient that it undermined his ability to make an intelligent decision" about pleading guilty versus going to trial.  *Turner v. Calderon*, 281 F.3d 851, 880 (9th Cir. 2002) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir.

19

1992)).

Any reasonable reader of the trial transcript would find the evidence against Campa overwhelming.  Had counsel advised him to go to trial, counsel's competence might require a close look; the competence of advising a guilty plea is not questionable.  No reasonable probability exists that a reasonable person in Campa's position should have chosen to stand trial.  Regardless of whether Campa pled guilty or was convicted at trial, the Arizona scheme would still count against him at sentencing, and the terms for each count could still run consecutively. Campa has never suggested he would have accepted the terms of a plea offer, rather than taking an open plea, if he had known any of the facts he now claims he did not know.  *See, e.g.*, *Lafler* Status Report (Doc. 141) at 1-2; Hr'g Tr. (Doc. 461-1) at 24:13-18.  There was no realistic prospect of acquittal on any count. Neither prong of the *Strickland* test is met.  This claim is denied.

### D.  Detention Hearing

Campa claims Branom provided ineffective assistance with respect to Campa's pretrial detention.  Campa claims Branom "agreed with movant that there was grounds for a detention re-hearing," without saying what his grounds were. Campa alleges no fact from which the Court could infer Branom's performance was unreasonable.  It appears that the motion Branom filed rested on a meritless ground, *see* [Second] Mot. for Detention Hr'g (Doc. 196) at 1 (referring to

Campa's need to search for documents related to his defense), but that was apparently the only ground that existed.

Likewise no allegation of fact exists from which the Court could infer a reasonable probability Campa would have been released if Branom had sought a rehearing of Campa's pretrial detention.  Campa was detained because he committed another felony fraud while released pending trial on a felony fraud charge in 1993.  *See* Detention Hr'g Tr. (Doc. 458) at 32:8-33:17.  No reasonable probability existed that he would have been released before trial.

Campa's claim of prejudice, however, is more dramatic than the mere prospect of obtaining pretrial release.  Campa claims that, if only he had been released before trial, "all court proceedings would no doubt have ended favorably for [Campa] and his family."  Am. § 2255 Mot. at 3A.  Nothing in Campa's or the other defendants' extensive post-judgment submissions and nothing in the record of the case gives any prospect of support to this assertion.

Neither prong of the *Strickland* test is met.  This claim is denied.

**E. Right to Counsel of Choice**

Campa claims there was "no official pretrial court order restricting access" to "disputed funds."  Am. § 2255 Mot. at 4A ¶ j.  He states that the funds in question were deposited in the "Krisztian Gal d/b/a/ Suzette Gal" account.  *Id.* at 6A ¶ L (referring to Ex. P (Doc. 613-1 at 19)); Hr'g Tr. (Doc. 461-1) at 6:23-7:5,

7:21-9:10, 9:23-10:6, 19:1-13, 22:2-7.  That was the account containing proceeds

of the Arizona fraud.

This issue proves unpersuasive.  The fact that the United States *could* prove

the funds in the account had been proceeds of a fraud was evidenced by the fact

that the United States *did* prove it.  *See supra* at 9-11.

Campa points to an email to defendants' counsel from AUSA Rostad in

which he stated that seeking a pretrial restraining order would "complicate things

mightily."  *See* Am. § 2255 Mot. at 2C.  Here is the statement in context:

> [O]n September 11 I tried to alert the Gal family that they should not
> squander the money in a [sic] the K Gal dba S Gal account.  **The
> proceeds in it are monies obtained by fraud.**  However, in the
> month since their arrest they have withdrawn over $115,000.  The
> balance is down to $207,000.  I emphasized to the other Gal counsel
> that if they tap that account anymore I will be petitioning the Court to
> have their release revoked and have them arrested for committing a
> federal crime while on release, that is, possession of stolen property.
> 18 U.S.C. § 2315.  *See* 18 U.S.C. § 3147.  When we check next week
> there had better be $207,677.90 in that account and it needs to remain
> untouched.  I am reluctant to take that step because it complicates
> things mightily, but I can't stand by and let them drain off the one pot
> of money that might be used to reimburse some of the victims.

Campa Ex. 2b (Doc. 625-3) at 1 (emphasis in original).  The context of the email

shows that the "complication" referred to additional proceedings, not to the

difficulty of proving anything to the required standard.

In addition, the procedural context in which the statement was made

supports this interpretation.  When Campa completed his financial affidavit in

support of his request for counsel, he declined to state how much money he made per month as an employee of the Liberty Bell Gold Mine—that is, the Arizona scheme.  He also declined to state whether he received any other income in the preceding 12 months.  *See* Financial Aff. CJA-23 (Doc. 25) at 1 (filed under seal). And Campa admitted lawyers would not take his money.  Hr'g Tr. (Doc. 461-1) at 8:16-19; *see* also Arraignment Tr. (Doc. 451) at 4:19-6:2; Initial Appearance Tr. (Doc. 450) at 6:2-19.

Nothing the United States did or said stopped Campa from explaining to private counsel how much money he had or from showing the attorney that it came from a source sufficiently clean to avoid forfeiture.  *Luis v. United States*, __ U.S. __, 136 S. Ct. 1083 (2016), *see* Notice of Supp. Authority (Doc. 626), involved funds untainted by illegal activity.  The controlling case is *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989):  "There is no constitutional principle that gives one person [Campa] the right to give another's property [victims' investment funds] to a third party [private counsel], even where the person seeking to complete the exchange wishes to do so in order to exercise a constitutionally protected right."  *Id.* at 628.

Finally, what Campa calls the United States' "threat" was directed at the Gals, not Campa.  *See* Campa Ex. 2b (Doc. 625-3) at 1.  Although Campa has repeatedly asserted he was entitled to obtain the benefit of the money in the

relevant accounts, to this day, he has never produced evidence that he held a legally cognizable interest in the "Krisztian Gal d/b/a/ Suzette Gal" account. Campa's counsel, *see* Am. § 2255 Mot. at 7A, had no basis for filing a motion of any kind to support Campa's right or access to those funds.

Lack of ability to retain counsel of one's choice is not the same thing as being deprived of counsel of choice. Campa was not deprived of the counsel of his choice. The Ninth Circuit reached that conclusion. *See* Mem. at 17, *Campa*, No. 14-30012. Nothing Campa has said since then undermines or calls that decision into question. *See, e.g.*, *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). This claim is denied.

### F. Motions to Recuse Trial Judge and Withdraw Guilty Plea

Campa's complaints about the validity of his motions to recuse Judge Haddon and to withdraw his guilty plea, Am. § 2255 Mot. at 5A-7A; *id.* at 1B, 3B, lack merit. "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). They do so only if "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* Judge Haddon's opinion that Krisztian Gal, though a financial offender, was as dangerous to the public as someone "walking down the street with a loaded firearm," *see* Hr'g Tr. (Doc. 361) at 28:22-29:10, was not the sort of comment that would support recusal. And Campa did not and has not

24

pointed to a fair and just reason to withdraw his guilty plea.  These claims are denied.

### G. Sentencing Counsel

Campa claims that his new counsel at sentencing should have called witnesses to defend the integrity of the Arizona mining scheme.  In addition to the testimony presented at Campa's sentencing, the Arizona State Corporation Commission issued a cease and desist order to stop Crystal Pistol and Liberty Bell from continuing to solicit investment, and that order included Pocklington.  *See* Campa Sentencing Tr. (Doc. 546) at 16:10-17:18, 21:23-23:4, 23:22-24:6, 42:14-43:24, 46:25-47:5; *see also* K. Gal Sentencing Tr. (Doc. 526) at 9:19-44:13 (quoting, in part, from Arizona Order to Cease and Desist); S. Gal Sentencing Tr. (Doc. 478) at 18:3-19:9.  No reason exists to believe any witness could have defended the lawfulness of the Arizona scheme.  Campa has failed to explain how it would have been helpful to call Holefca, who invested $4.5 million in the fraudulent scheme, to testify at Campa's sentencing.  Neither prong of the *Strickland* test is met.  This claim is denied.

### IV.  Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2255 Proceedings.  A COA should issue as to those claims on which the petitioner

makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. §

2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the

district court's resolution of [the] constitutional claims" or "conclude the issues

presented are adequate to deserve encouragement to proceed further."  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484

(2000)).

Defendants Campa, Suzette Gal, and Andras Gal contend that misconduct by

Suzette's counsel, Jeffry Foster, prejudiced all of them.  Each of them was given an

opportunity to identify any instance of misconduct on Foster's part or on the part

of other counsel as prompted or compelled by Foster.  None of them was able to

allege any fact that, if true, would support an inference that any attorney's

performance was unreasonable or that a different outcome for any or all of them

was reasonably probable.  No defendant has met either prong of the *Strickland* test

regarding Foster.  No COA is warranted on this issue, the only one raised by

Defendants Suzette Gal and Andras Gal.

Campa raised additional claims, but they too lack merit.  In essence, Campa

identifies matters that he wishes had been conducted differently and asserts that

counsel was ineffective because those matters were not conducted differently.

Campa's complaints find no foothold in law, and most also lack a foothold in fact.

When Campa was arrested, he immediately admitted his own guilt and insisted his

26

family members were innocent.  He testified at trial that he was guilty and his family members were innocent.  He maintained at sentencing that the Arizona gold-mining scheme was "100 percent legitimate."  The jury and the sentencing judge found his positions unworthy of belief.  Campa has not identified any reason to believe counsel was at fault for Campa's lack of credibility and therefore has made no showing that he was denied a constitutional right.  Reasonable jurists would not encourage further proceedings.  A COA is not warranted on any issue.

Accordingly, IT IS HEREBY ORDERED as follows:

1.  Campa's post-trial submissions (Docs. 613, 617, 618, 625, 626) are RECHARACTERIZED as a motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 and are DENIED for lack of merit.

2.  Suzette Gal's post-trial submissions (Docs. 609, 619) are RECHARACTERIZED as a motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 and are DENIED for lack of merit.

3.  Andras Gal's post-trial submissions (Docs. 611, 620, 622) are RECHARACTERIZED as a motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 and are DENIED for lack of merit.

4.  A certificate of appealability is DENIED as to all defendants on all issues.  The clerk shall immediately process the appeal for any defendant who files a notice of appeal.

5.  The Clerk of Court shall ensure that all pending motions in this case and in CV 16-10-GF-BMM (Campa), CV 16-11-GF-BMM (S. Gal), and CV 16-16-GF-BMM (A. Gal) are terminated and shall close the civil files by entering judgment in favor of the United States and against the appropriate defendant.

6.  Motions for reconsideration will not be entertained.  Each defendant's recourse now lies in appeal of this disposition.

DATED this 6th day of June, 2016.


Brian Morris
United States District Court Judge